```
          FILED
   CLERK, U.S. DISTRICT COURT

        FEB 21 2002

CENTRAL DISTRICT OF CALIFORNIA
BY                       DEPUTY
```

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COALITION OF CLERGY, et al., ) | CASE NO. CV 02-570 AHM (JTLx) |
| Petitioners, ) | **ORDER DISMISSING PETITION FOR WRIT OF HABEAS CORPUS AND FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS** |
| v. ) | |
| GEORGE WALKER BUSH, et al., ) | |
| Respondents. ) | |

```
          ENTERED
   CLERK, U.S. DISTRICT COURT

        FEB 22 2002

CENTRAL DISTRICT OF CALIFORNIA
BY                       DEPUTY
```

## I.

## PROCEDURAL BACKGROUND AND SUMMARY OF RULING

This case results from the sudden attacks on the United States on September 11, 2001, resulting in the deaths of thousands of innocent civilians. Within a few days, the President, with the approval of Congress (Pub. L. No. 107-40 (September 8, 2001)), commanded the Armed Forces of the United States to use all necessary and appropriate force against the persons responsible for those attacks, who soon came to be known as the "Al Qaeda terrorist network." The President dispatched American forces to Afghanistan, where that group was believed to be functioning with the active support of the "Taliban" government then in power in that country. In the course of combat operations, American forces, as well as other nations allied with the United States, captured or secured

1   the surrender of thousands of persons.  Beginning in early January 2002, the

2   Armed Forces transferred scores of these captives to the United States Naval Base

3   at Guantanamo Bay, Cuba ("Guantanamo").  Their confinement in Guantanamo

4   led to this action.

5        Petitioners are a group referring to themselves as the "Coalition of Clergy,

6   Lawyers, and Professors."  They include at least two journalists; ten lawyers;

7   three rabbis; and a Christian pastor.  Some of these individuals are prominent

8   professors at distinguished law schools or schools of journalism.  One is a former

9   Attorney-General of the United States.  On January 20, 2002 they filed a Verified

10  Petition for Writ of Habeas Corpus on behalf of "Persons Held Involuntarily at

11  Guantanamo Naval Air Base, Cuba."  In substance, the petition alleges that the

12  captives held at Guantanamo (the "detainees") are in custody in violation of the

13  Constitution or the laws or treaties of the United States, in that they: (1) have

14  been deprived of their liberty without due process of law, (2) have not been

15  informed of the nature and cause of the accusations against them and (3) have not

16  been afforded the assistance of counsel.  The petition also suggests, somewhat

17  elliptically, that the detainees have rights under the Geneva Convention that have

18  been violated, such as "prohibition of [*sic*] transferring persons taken prisoner in

19  [*sic*] war from the country of their capture."  (Pet. Memo. 7:16-17)

20       Petitioners allege that "[b]ecause the persons for whom relief is sought

21  appear to be held incommunicado and have been denied access to legal counsel,

22  application properly is made by petitioners acting on their behalf.  28 U.S.C. §

23  2242. . . ."  (*Id.* 7:20-23)

24       The relief that petitioners seek is a writ or order to show cause (1) directing

25  the respondents to "identify by full name and country of domicile and all other

26  identifying information in their possession each person held by them within three

27  days;" (2) directing respondents "to show the true cause(s) of the detention of

28

2

1   each person;" and (3) directing respondents to produce the detainees at a hearing

2   in this court. (*Id.* 8:14-23; 9:1-3)

3   The persons named as respondents are President George W. Bush;

4   Secretary of Defense Donald H. Rumsfeld; Richard B. Myers, the Chairman of

5   the Joint Chiefs of Staff; Gordon R. England, the Secretary of Navy; and five

6   other named individuals and "1000 Unknown Named United States Military

7   Personnel," all of whom are alleged to be military officers responsible for the

8   operations at the Guantanamo Naval Base.

9   On January 22, 2002, two days after the petition was filed, the Court

10   presided over a brief hearing at which it expressed strong doubts that it has

11   jurisdiction to entertain the petition. The Court ordered the parties to address that

12   threshold question in written briefs. They have done so and appeared at a second

13   hearing today.[1]

14   Having reviewed and considered all the arguments and conducted

15   additional research on its own, the Court rules as follows:

16       1.      Petitioners do not have standing to assert claims on behalf of the

17               detainees.

18       2.      Even if petitioners did have standing, this court lacks jurisdiction to

19               entertain those claims.

20

21

22       [1] On February 11, 2002, after the parties had filed their respective briefs on
the threshold jurisdictional issues, petitioners filed a "First Amended" petition

23   purporting to add a claim under what they refer to as the "cruel and unusual clause"

24   of the Eighth Amendment. Counsel for petitioners had acknowledged at the hearing
"I'm going to have to proceed on the petition as it is right now. And if a decision is

25   reached to add an Eighth Amendment claim, then I'm going to have to ask for

26   permission to do that." He neither sought nor received permission. Moreover, the
court instructed the parties that "if there is jurisdiction the petition could be amended

27   at a later time." (Tr., p.10-11) The Amended Petition does not affect, much less

28   cure, the jurisdictional defects described below, and this Order applies to both
petitions.

3.     No federal court would have jurisdiction over petitioners' claims, so there is no basis to transfer this matter to another federal district court.

4.     The petition must be dismissed.

## II.

## THE WRIT OF HABEAS CORPUS

Given the importance of the issues that petitioners proclaim are at stake in this case, a decidedly abbreviated description of the writ of habeas corpus is appropriate.

> The writ of habeas corpus, providing a means by which the legal authority under which a person is detained can be challenged, is of immemorial antiquity . . . The precise origin of the writ . . . is not certain, but as early as 1220 A.D. the words *"habeas corpora"* are to be found in an order directing an English sheriff to produce parties to a trespass action before the Court of Common pleas. . . . Today it is regarded as "perhaps the most important writ known to the constitutional law of England . . . ."
>
> Its significance in the United States has been no less great. Article I, ¶ 9 of the Constitution gives assurance that the privilege of the writ of habeas corpus shall not be suspended, unless when in cases of rebellion or invasion the public safety may require it, and its use by the federal courts was authorized [as long ago as in] . . . the Judiciary Act of 1789.

WRIGHT, MILLER AND COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION 2D § 4261 and n.3 (citations omitted).

The statutory authorization for a federal judge to issue a writ of habeas corpus currently is set forth in 28 U.S.C. § 2241, *et. seq.*  In essence, when a judge issues such a writ, the authorities responsible for the petitioner's custody are required to demonstrate that he is being detained lawfully.  As Mr. Justice Black put it, the "grand purpose" of the writ of habeas corpus is "the protection of individuals against erosion of their right to be free from wrongful restraints upon

4

1  their liberty." *Jones v. Cunningham*, 371 U.S. 236, 243, 83 S.Ct. 373, 377

2  (1963).[2]

3      Although the writ of habeas corpus plays a central role in American

4  jurisprudence, there are many limitations on a court's authority to issue such a

5  writ. Here, in urging the court to dismiss the petition - - i.e., effectively refuse to

6  issue a writ - - respondents invoke three such limitations. They contend:

7  (1) petitioners lack "standing" to come to this court - - i.e., they are not entitled to

8  ask the court on the detainees' behalf to order respondents to justify the detention

9  of the detainees; (2) this particular federal court lacks jurisdiction to entertain the

10  petition; and (3) no federal district court anywhere has jurisdiction. Respondents

11  are correct as to all three contentions.

12  ## III.

13  ## PETITIONERS DO NOT HAVE STANDING

14      Respondents argue that petitioners lack standing to assert claims on behalf

15  of the detainees. Whether a plaintiff (or, in the case of a habeas proceeding, a

16  petitioner) has standing "is the threshold question in every federal case,

17  determining the power of the court to entertain the suit . . . . The Art. III judicial

18  power exists only to redress or otherwise to protect against injury to the

19  complaining party, even though the court's judgment may benefit others

20  collaterally. . . ." *Warth v. Seldin*, 422 U.S. 490, 498-499, 95 S. Ct. 2197, 2205

21  (1975).

22      28 U.S.C. § 2242 provides that "[a]pplication for a writ of habeas corpus

23  shall be in writing signed and verified by the person for whose relief it is intended

24  *or by someone acting in his behalf.*" (Emphasis added). Courts use the term

25

26

---

27      [2] The foregoing discussion involves only the writ of habeas corpus "ad

subjiciendum," which compels an inquiry into the cause of restraint. There are other

28  writs of habeas corpus, but they are irrelevant here.

1  "next friend" to describe the person who acts on behalf of another person (the

2  "real party in interest") for whom the relief is sought.  The "next friend" has the

3  burden "clearly to establish the propriety of his status and thereby justify the

4  jurisdiction of the court."  *Whitmore v. Arkansas*, 495 U.S. 149, 110 S. Ct. 1717,

5  1727 (1990).

6      A number of courts have allowed habeas petitions to be filed by "next

7  friends," although in circumstances different from those here.  *See, e.g., U.S. ex*

8  *rel. Toth v. Quarles*, 350 U.S. 11, 76 S. Ct. 1 (1955) (sister, on behalf of ex-

9  serviceman civilian who was arrested by military authorities and taken to Korea

10  to stand trial before a court-martial); *Vargas v. Lambert*, 159 F.3d 1161 (9th Cir.

11  1998) (mother of state court prisoner slated to be executed for murder, where

12  mother made showing sufficient to establish her son's lack of mental competence

13  to waive his right of appeal); *Nash v. MacArthur*, 184 F.2d 606 (D.C. Cir. 1950)

14  (attorney, on behalf of seven Japanese nationals convicted of war crimes by

15  military commissions).

16      In seeking dismissal of this petition on the basis that petitioners lack "next

17  friend" standing, respondents rely primarily on *Whitmore v. Arkansas, supra*.  In

18  *Whitmore*, the named petitioner was a death row inmate.  He sought to intervene

19  in an Arkansas state court criminal proceeding in order to prosecute an appeal on

20  behalf of one Simmons, who had been convicted of multiple murders and had

21  waived his right to direct appeal.  Whitmore tried to get permission to appeal on

22  behalf of Simmons on the basis that the heinous facts in Simmons's cases would

23  become included in a database that Arkansas uses for purposes of comparative

24  reviews of capital sentences.  Whitmore contended that inclusion of the

25  information about Simmons would make him - - Whitmore - - appear less

26  deserving of execution.  Whitmore also purported to proceed as "next friend" of

27  Simmons, hoping to overturn the latter's death sentence on appeal.  Although

28  Whitmore was not seeking a writ of habeas corpus on behalf of Simmons, the

6

1  Supreme Court analogized his effort to that of a "next friend" in a habeas case,

2  and defined the prerequisites for "next friend" standing.

> First, a "next friend" must provide an adequate explanation - -
> such as inaccessibility, mental incompetence, or other disability -
> - why the real party in interest cannot appear on his own behalf to
> prosecute the action . . . . [Citation].   Second, the "next friend"
> must be truly dedicated to the best interests of the person on
> whose behalf he seeks to litigate . . . . [Citation].   [It also] has
> been further suggested that a "next friend" must have some
> significant relationship with the real party in interest.

8  *Id.* at 162-64 (citations omitted).  The Court then held that Whitmore lacked

9  standing because "there was no meaningful evidence that [Simmons] was

10  suffering from a mental disease, disorder or defect that substantially

11  affected his capacity to make an intelligent decision." *Id.* at 166.

12  The Ninth Circuit has stated that under the *Whitmore* test, "[i]n order to

13  establish next friend standing, the putative next friend must show (1) that the

14  petitioner is unable to litigate his own cause due to mental incapacity, lack of

15  access to court, or other similar disability; and (2) the next friend has some

16  significant relationship with, and is truly dedicated to the best interests of,

17  petitioner." *Massie ex. rel. Kroll v. Woodford*, 244 F.3d 1192, 1194 (9th Cir.

18  2001).  The court will now address this two-prong test.

19  A.   **Lack of Access to the Court**.

20  *Whitmore* and the other cases on which respondents rely are all factually

21  distinguishable because the real party in interest clearly *did* have access to the

22  court, could have filed a petition in his own behalf and chose not to do so.  Thus,

23  in *Brewer v. Lewis*, 989 F.2d 1021 (9th Cir. 1993), the person denied standing to

24  seek a writ of habeas corpus was a condemned prisoner's mother.  Her son had

25  explicitly sought to abandon all further judicial proceedings, and the mother was

26  unable to establish that he was incompetent.  *Id.* at 1025-1026.  Similarly, in

27  *Massie* a death row inmate filed a federal habeas corpus petition but then moved

28  to dismiss it.  A journalist who had dealt with the inmate for fifteen years

thereupon filed a "next friend" petition on behalf of the inmate.  Like the mother in *Brewer* and the "next friend" in *Whitmore*, the journalist failed to present "meaningful evidence" of the inmate's alleged incompetency to dismiss his own habeas corpus petition.  Moreover, at oral argument before the Ninth Circuit, the inmate explicitly opposed the journalist's petition. *Id.* at 1195.  Not surprisingly, the Court found that the journalist lacked standing. *Id.* at 1199.[3]

Here, although the hastily-prepared petition is far from a model of precision or clarity, it does at least allege that the Guantanamo detainees "appear to be held incommunicado and have been denied access to legal counsel. . . ." Pet. Memo. 7:20-23.  This is tantamount to alleging lack of access to the court. But standing alone, conclusory allegations such as these are not sufficient to establish standing. *Brewer*, 989 F.2d at 1026; *Massie*, 244 F.3d at 1197 ("meaningful evidence" required; "conclusory opinions" are insufficient).  In this case, petitioners' assertions that the detainees are totally incommunicado are not supported by the news articles they attached to the petition.  Indeed, as respondents point out, the news articles actually contradict the assertions.  Some of the articles reflect that the detainees were given the opportunity to write to friends or relatives (Pet. Mem. p.10); others state that some detainees had already been in contact with diplomats from their home countries (Pet. Mem. pp.16:20-21); yet other articles state that a team from the International Red Cross met with the detainees (Pet. Mem. p.15).  In their brief filed a week after respondents' brief, petitioners did not explain these inconsistencies, much less provide a basis

---

[3] Compare *Groseclose v. Dutton*, 594 F. Supp. 949 (M.D. Tenn. 1984), where next friends, including a death row inmate, minister and two anti-death penalty organizations, were permitted to proceed.  There, the real party in interest did not oppose their efforts and the petitioners demonstrated that his previous waiver of the right to file a habeas petition was involuntary. *Groseclose*, 594 F. Supp. at 951, 961-62.

1   for the court to disregard them.[4]  Moreover, the Court has been informed that on

2   February 19, 2002, the parents of three specified Guantanamo detainees did file

3   suit on behalf of their respective sons. *Shafiq Rasul, et al. v. Bush*, No. 02-CV

4   00299 (D., D.C.)  *See,* "Suit Says U.S. Violates Prisoners Rights in Cuba," Wall

5   Street Journal, February 20, 2002, at A10.

6           Respondents are correct that as to the first prong of the *Whitmore-Massie*

7   test, the immediate question before this court is the adequacy of the allegations in

8   the petition concerning lack of access to court.  They are also correct that the

9   allegations fail to satisfy that prong.  But in court today, counsel for respondents

10   displayed commendable candor in acknowledging that from a practical point of

11   view the detainees cannot be said to have unimpeded or free access to court.

12   Despite the recent filing of a second lawsuit, it would be naive for this court to

13   find that they do enjoy such access.   Thus, although it makes no actual finding on

14   the issue, the court will proceed to analyze the second prong under the

15   supposition that the detainees lack access to court.

16   B.   **Significant Relationship With The Detainees or "Uninvited Meddlers."**

17           The second prong of the *Whitmore-Massie* "next friend" test requires the

18   petitioners to demonstrate that they have a "significant relationship" with the

19   detainees.  Respondents argue that petitioners cannot demonstrate that they are

20   dedicated to the best interests of the Guantanamo detainees because they have not

21   demonstrated such a relationship.  On the question of what constitutes a

22   significant relationship, respondents cite *Davis v. Austin*, 492 F. Supp. 273 (N.D.

23   Ga. 1980), in which a distant relative and a minister were not permitted to

24   proceed on behalf of a death row inmate.  But in *Davis* the real party in interest

25   explicitly made a competent decision to forego further proceedings.  It was

26   

27           [4] The Court may take judicial notice of the information in the articles attached

28   to the petition.  Fed. R. Evid. 201(b).  Indeed, both sides cite these articles for
    different purposes.

1   because the "next friends" were proceeding *contrary* to the inmate's wishes that

2   the court found they lacked standing - - not because their ties were too remote.

3   *Id.* at 275-276.

4       Respondents also cite *Lenhard v. Wolff*, 443 U.S. 1306, 100 S. Ct. 3

5   (1979), in arguing that petitioners fail to demonstrate a significant relationship

6   with the detainees.  In *Lenhard*, then-Justice Rehnquist granted a stay of a

7   prisoner's execution on an application filed by two deputy public defenders who

8   had been appointed by the trial court.  In *dicta*, Justice Rehnquist noted that

9   "however worthy and high minded the motives of 'next friends' may be, they

10  inevitably run the risk of making the actual defendant a pawn to be manipulated

11  on a chessboard larger than his own case." *Id.* at 1312.  However, in *Lenhard*, the

12  lawyers' right to petition on behalf of the inmate was not in question.  Indeed,

13  Justice Rehnquist lauded them for their "commendable fidelity to their

14  assignment . . . ." *Id.* at 1308.  Moreover, he stated,

15      [I]t strikes me that from a purely technical standpoint a public
    defender may appear as "next friend" with as much justification as

16      the mother of [the real party in interest] . . . .

17  *Id.* at 1310.

18      Although *Davis* and *Lenhard* are weak authority for respondents, *Whitmore*,

19  *supra*, does buttress their contention that petitioners lack standing, particularly this

20  language:

21

22      [L]imitations on the "next friend" doctrine are driven by the
    recognition that it was not intended that the writ of habeas

23      corpus should be availed of, as a matter of course, by
    intruders or uninvited meddlers, styling themselves next

24      friends . . . . Indeed, if there were no restriction on "next
    friend" standing in federal courts, the litigant asserting only

25      a generalized interest in constitutional governance could
    circumvent the jurisdictional limits of Art. III simply by

26      assuming the mantle of "next friend."

27  *Whitmore*, 495 U.S. at 163.

28

10

1    The court recognizes that the named petitioners have filed this petition

2 because they perceive there are rights that need to be vindicated. But that

3 consideration, standing alone, does not necessarily make them "uninvited

4 meddlers" within the meaning of *Whitmore*.[5]  *See Warren v. Cardwell*, 621 F.2d

5 319, 321 n.1 (9th Cir. 1980) (California lawyer who filed a petition in his own

6 name on behalf of an Arizona inmate not accessible because of a prison lockdown

7 "was not an uninvited meddler"). There is a difference between being "uninvited

8 because you are meant to be excluded" and being "uninvited but welcome." The

9 next friend/would-be petitioners in the cases upon which respondents rely fall

10 into the former category, because their efforts were at odds with the desires of the

11 real parties on whose behalf they were attempting to proceed. That is not the case

12 here, because there is no evidence that the Guantanamo detainees affirmatively

13 object to the petitioners' efforts, and common sense suggests that they would not.[6]

14  But neither is there evidence that they are welcome, so petitioners cannot

15 demonstrate that they fall into the latter category.

16    More than four weeks have elapsed since petitioners filed the original

17 petition. In that period, petitioners' counsel has filed a brief on jurisdiction, an

18 amended petition and numerous other memoranda and declarations on other

---

20    [5] In using the term "uninvited meddlers" in *Whitmore*, Chief Justice Rehnquist

21 cited to *United States ex rel. Bryant v. Houston*, 273 F. 915, 916 (2d Cir. 1921).

22 There, the named petitioner failed to disclose anywhere in her petition who she was,
what relationship, if any, she had with the real party in interest or whether the real

23 party was unable to file the petition himself. Chief Justice Rehnquist also cited to

24 *Rosenberg v. United States*, 346 U.S. 273, 291-292, 75 S. Ct. 1152, 1161-1162
(1953). There, the real parties in interest already had several attorneys but their

25 habeas petition was prepared by another lawyer who sought to intervene. Justice

26 Frankfurter noted that the legitimate counsel of record "simply had been elbowed out
of the control of their case" by the lawyer who filed the habeas petition. *Id.*

27

28    [6] As Justice Frankfurter stated in a different context, "Nor does law lag behind
common sense." *Ludecke v. Watkins*, 335 U.S. 160, 167, 68 S.Ct. 1429, 1432
(1948).

11

1   issues.  During that same period, the names of at least some of the detainees have

2   been published by the national press and, as indicated above, parents of three

3   specified detainees have filed suit.  Yet there is nothing in the record even

4   suggesting that *any* of the Guantanamo detainees supports this petition.  Not one

5   friend, relative, diplomatic or religious representative, fellow countryman or

6   anyone with a direct tie to a particular detainee has authorized this petition.

7   Common sense suggests that something is seriously awry in petitioners' claims to

8   be the appropriate representatives of the detainees.  This conclusion is reinforced

9   by yet another telling factor: nowhere have petitioners alleged, much less filed a

10  declaration, that they *attempted* to communicate with the detainees and were

11  prevented from doing so.  Although petitioners may regard such efforts as futile

12  and thus unnecessary, to bolster their claimed standing as "next friends" it would

13  have been helpful if they had tried anyway.[7]

14          To summarize, the court finds that the cases on which respondents rely to

15  establish that petitioners lack a sufficient relationship with the detainees or that

16  petitioners can be dismissed as "uninvited meddlers" are all factually

17  distinguishable.  Yet these cases state the governing legal principles of standing,

18  and this district court is required to apply them.  Petitioners may not be "uninvited

19  meddlers" in the same sense as the petitioners in those cases, but they do lack a

20  "significant relationship" with the detainees - - indeed, any relationship.  To

21  permit petitioners to seek a writ of habeas corpus on a record devoid of any

22  evidence that they have sought authorization to do so, much less obtained implied

23  authority to do so, would violate the second prong of the *Whitmore-Massie* test.

24  _____

25          [7]  The court is not suggesting that the mere failure of a "next friend" to

26  establish direct communication with the prisoner and obtain explicit authorization
    from him is enough to preclude "next friend" petitioners.  If it were, then there would

27  be an incentive for the government to keep all captives, even United States citizens,

28  incommunicado.  Although respondents are not advocating that unacceptable and
    illegal result, a too-expansive interpretation of "uninvited meddlers" could lead to
    it.

1   And it would invite well-meaning proponents of numerous assorted "causes" to

2   bring lawsuits on behalf of unwitting strangers.  For these reasons, then, the court

3   finds that petitioners lack standing to file this petition on behalf of detainees.[8]

4        Under standard principles governing leave to amend pleadings, if

5   petitioners sought to amend their petition in order to supplement their claims of

6   standing, this court would be expected to grant such leave.  That is not the case,

7   however, if the amended petition, or any amended petition,  would be a legal

8   "futility" because it could not satisfy the other jurisdictional requirements.  For

9   that reason, the court must proceed to discuss those requirements, for if they

10  preclude this court from exercising jurisdiction then the petition should be

11  dismissed without leave to amend.

12                              **IV.**

13  **THIS COURT LACKS JURISDICTION TO ISSUE THE WRIT
    BECAUSE NO CUSTODIAN IS WITHIN THE TERRITORIAL
14  JURISDICTION OF THE COURT.**

15       Respondents argue that even if petitioners have standing this court lacks

16  jurisdiction to entertain this petition because no custodian responsible for the

17  custody of the detainees is present in the territorial jurisdiction of this district.

18  Respondents are correct.

19       The federal statute governing habeas petitions provides that "writs of

20  habeas corpus may be granted by the Supreme Court, any justice thereof, the

21

22

23       [8] At the hearing today, Prof. Erwin Chemerinsky, one of the named petitioners

24  (but not the author of petitioners' court papers), argued that the requirement that
    "next friends" demonstrate a "significant relationship" with the real parties in

25  interest should be relaxed where the real parties lack access to court.  He urged that

26  general principles of standing under the constitutional requirements of Art. III favor
    such an approach.  The court chooses to apply the standards enunciated in the

27  *Whitmore-Massie* line of cases and notes that in *Whitmore* the Supreme Court stated

28  that the limitations on standing that it was applying were in fact required by Article
    III, and were not based merely on "prudential" limitations. 492 U.S. at 156 n. 1.

district courts and any circuit judge *within their respective jurisdictions*." 28 U.S.C. § 2241(a) (emphasis added). As the Supreme Court has explained, "the phrase 'within their respective jurisdictions' acts as an obvious limitation upon the action of individual judges" because it reflects the conclusion of Congress that it would be "inconvenient, potentially embarrassing, certainly expensive and on the whole quite unnecessary to provide every judge anywhere with the authority to issue the Great Writ on behalf of applicants far distantly removed from the courts whereon they sat." *Carbo v. United States*, 364 U.S. 611, 617, 81 S. Ct. 338, 342 (1961).[9]

In *Schlanger v. Seamans,* 401 U.S. 487, 91 S. Ct. 995 (1971), the Supreme Court held that the Arizona District Court lacked jurisdiction over a habeas petition because the only custodian of the petitioner was outside that district. *Id.* at 490-91. It stated, "the District Court in Arizona has no custodian within its reach against whom its writ can run. . . . [T]he absence of [petitioner's] custodian is fatal to the jurisdiction of the Arizona District Court." *Id.* at 491. The Ninth Circuit has applied this rule several times, and the rule is so well-settled that it is unnecessary to cite these cases. Moreover, the Ninth Circuit has expressly held that 28 U.S.C. § 1391(e), which provides for nationwide service of process on officers of the United States, does not extend habeas corpus jurisdiction to persons outside the territorial limits of the district court. *Dunne v. Henman*, 875 F. 2d 244, 248 (9th Cir. 1989); *accord, Schlanger,* 401 U.S. at 490 n.4.[10]

---

[9] In *Braden v. 30th Judicial Circuit Court*, 410 U.S. 484, 93 S. Ct. 1123 (1973), the Supreme Court noted that a writ of habeas corpus is issued to the person who has allegedly detained the prisoner unlawfully and held that a federal court with jurisdiction over the custodian can exercise jurisdiction even if the prisoner is outside that court's jurisdiction.

[10] Despite the clear holding of these cases, petitioners' counsel argued in his brief that section 1391 permits this court to subject the respondents to jurisdiction on this basis.

1    It is clear, then, that because there is no showing or allegation that any

2  named respondent is within the territorial jurisdiction of the Central District of

3  California, this court lacks jurisdiction to issue the writ requested by petitioners.

4  It is also true, however, that in cases where the petitioner's direct custodian is

5  outside the territorial jurisdiction of the court where the petition is filed,

6  jurisdiction does lie in a district court where anyone in the "chain of command"

7  with control over the petitioner is present. *Ex Parte Hayes*, 414 U.S. 1327, 1328,

8  94 S. Ct. 23, 24 (1973); *cf. Kinnell v. Warner*, 356 F. Supp. 779, 782 (D. Hawaii

9  1973) ("Anyone in the 'chain of command' with control over petitioner's

10  whereabouts is that petitioner's proper custodian for habeas purposes."). Here,

11  petitioners have named as respondents several individuals who are custodians of

12  the detainees, either because they are directly responsible for their detention or

13  are within the "chain of command" of those directly responsible. At least some of

14  those respondents are present within the territorial jurisdiction of the District

15  Court for the District of Columbia. If the federal court in that district can exercise

16  jurisdiction over this petition, federal law, at least in this circuit, mandates not

17  dismissal, but transfer to that court.

18
19    Whenever a civil action is filed in a court . . . and that court finds
that there is a want of jurisdiction, the court shall, if it is in the
interest of justice, transfer such action . . . to any other such court
20    in which the action or appeal could have been brought at the time
it was filed or noticed . . . .

21  28 U.S.C. § 1631.
22
23    In *Miller v. Hambrick*, 905 F. 2d 259 (9th Cir. 1990), the Court

of Appeals stated,
24
25    Normally, transfer will be in the interest of justice because
normally dismissal of an action that could be brought elsewhere
is "time-consuming and justice defeating."...[This approach] was
26    adapted to habeas corpus in applying 28 U.S.C. § 2241(d), the
provision to habeas corpus in a State which contains two or more
27    judicial districts...Now under 28 U.S.C.§ 1631 the same approach
can be taken generally in habeas corpus proceedings...
28
*Id.* at 262 (citations omitted).

1    In *Cruz-Aguilera v. INS*, 245 F.3d 1070, 1073-74 (9th Cir. 2001), the Court

2 of Appeals cited the above language from *Miller* and added that "[b]ecause the

3 statute's language is mandatory, federal courts should consider transfer without

4 motion by the parties."

5    Transfer to the United States District Court for the District of Columbia is

6 appropriate if three conditions are met: (1) the transferring court lacks

7 jurisdiction; (2) the transferee court could have exercised jurisdiction at the time

8 the action was filed; and (3) the transfer is in the interest of justice. *Id.* As to

9 condition (1), this Court has already found that it lacks jurisdiction. As to

10 condition (3), a court is required to construe a habeas petition in the light most

11 favorable to the petitioners. That requires this court to assume, without actually

12 finding, that the allegations in this petition that the detainees' rights have been

13 violated are true. Construing the petition that way, transfer would be in the

14 interests of justice, for it would avoid a "'time-consuming'" and "'justice-

15 defeating'" dismissal. *Miller*, 905 F.2d at 262 (quoting *Goldlawr, Inc. v. Heiman*,

16 369 U.S. 463, 467, 82 S. Ct. 913 (1962)).

17    What remains for determination, therefore, is whether even though

18 respondents are within the jurisdiction of another court - - the District of

19 Columbia - - that court (or *any* federal court) has the authority to exercise

20 jurisdiction over the parties and claims asserted in this petition. It is to that

21 question that the Court will now turn.

22                                          **V.**

23 **NO DISTRICT COURT HAS JURISDICTION OVER THIS PETITION**

24 A.    ***Johnson v. Eisentrager* Compels Dismissal If the Detainees Are Outside
       the Sovereign Territory of the United States.**

25

26    As this Court suggested in its previous order, the key case is *Johnson v.*

27 *Eisentrager*, 339 U.S. 763, 70 S. Ct. 936 (1950). Because the Supreme Court's

28 holding in *Johnson* is controlling here, the decision warrants careful review.

1       In *Johnson*, Mr. Justice Jackson described "the ultimate question" as "one

2  of jurisdiction of civil courts of the United States vis-a-vis military authorities in

3  dealing with enemy aliens overseas." *Id.* at 765.  The case arose out of World

4  War II.  The habeas petitioners were twenty-one German nationals who claimed

5  to have been working in Japan for "civilian agencies of the German government"

6  before Germany surrendered on May 8, 1945.  They were taken into custody by

7  the United States Army and convicted by a United States Military Commission of

8  violating laws of war by engaging in continued military activity in Japan after

9  Germany's surrender, but before Japan surrendered.[11]  The Military Commission

10  sat in China with the consent of the Chinese government.  After trial and

11  conviction there, the prisoners were repatriated to Germany to serve their

12  sentences in a prison whose custodian was an American Army officer.  While in

13  Germany, the petitioners filed a writ of habeas corpus claiming that their right

14  under the Fifth Amendment to due process, other unspecified rights under the

15  Constitution and laws of the United States and provisions of the Geneva

16  Convention governing prisoners of war all had been violated.  *Id.* at 765-767.

17  They sought the same relief as petitioners here: that they be produced before the

18  federal district court to have their custody justified and then be released.  They

19  named as respondents the prison commandant, the Secretary of Defense and

20  others in the civilian and military chain of command.

21       Reversing the Court of Appeals, the Supreme Court in *Johnson* upheld the

22  district court's dismissal of the petition on the ground that petitioners had no

23  basis for invoking federal judicial power in any district.  *Id.* at 790-91.  In

24  reaching that conclusion, the Supreme Court stated the following:

25

26  ———————————

27     [11] The Supreme Court  has "characterized as 'well-established' the power of
the military to exercise jurisdiction over...enemy belligerents, prisoners of war or

28  others charged with violating the laws of war." *Johnson*, 339 U.S. at 286 (citations
deleted).

1
2
3
4
5
6
7
8

- "[T]he privilege of litigation has been extended to aliens, *whether friendly or enemy, only because permitting their presence in the country implied protection.* No such basis can be invoked here, for these prisoners at no relevant time were within any territory over which the United States is *sovereign* and the circumstances of their offense [and] their capture . . . were all beyond the territorial jurisdiction of any court of the United States." *Id.* at 777-78 (emphasis added).[12]

9
10
11
12
13
14

- "We are cited to no instance where a court, in this or any other country where the writ is known, has issued it on behalf of an alien enemy who, at no relevant time and in no stage of his captivity, has been within its territorial jurisdiction. Nothing in the text of the Constitution extends such a right, nor does anything in our statutes." *Id.* at 767.

15
16
17
18
19
20
21
22
23

- "A basic consideration in habeas corpus practice is that the prisoner will be produced before the court. . . .To grant the writ to these prisoners might mean that our army must transport them across the seas for hearing . . . . The writ, since it is . . . [argued] to be a matter of right, would be equally available to enemies during active hostilities. . . . Such trials would hamper the war effort . . . . It would be difficult to devise more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission

24

25
26
27
28

---

[12] In emphasizing the importance of sovereignty, the Court distinguished its earlier decision in *In re Yamashita*, 327 U.S. 1, 66 S. Ct. 340 (1946). There, a Japanese general convicted by an American Military Commission in the Philippines, challenged the authority of the Commission to try him. The Supreme Court denied his habeas petition on the merits. The *Johnson* court noted that, unlike the status of Guantanamo (*see infra*), the United States had "sovereignty" over the Philippines at the time, which is why Yamashita was entitled to access to the courts. *Id.* at 781.

18

1                      to call him to account in his own civil courts and divert his

2                      efforts and attention from the military offensive abroad to the

3                      legal defensive at home..." *Id.* at 778-79.

4       Although there has been no decision since *Johnson* that involves facts

5 comparable to those in this case, other courts have either followed *Johnson* or

6 acknowledged its precedential authority. *See, e.g., Zadvydas v. Davis*, 533 U.S.

7 678, 121 S. Ct. 2491, 2500 (2001) ("It is well established that certain

8 constitutional protections available to persons inside the United States are

9 unavailable to aliens outside of our geographic borders. *See, United States v.*

10 *Verdugo-Urquidez*, 494 U.S. 259, 269, 273-275, 110 S. Ct 1056 (1990) (Fifth

11 Amendment's protections do *not* extend to aliens outside the territorial

12 boundaries); *Johnson v. Eisentrager*, 339 U.S. 763, 784 (same).") In *Verdugo-*

13 *Urquidez, supra*, the Supreme Court also cited *Johnson* (494 U.S. at 273) and

14 added, "If there are to be restrictions on searches and seizures of aliens outside of

15 the United States which occur incident to . . . American action [abroad], they must

16 be imposed by the political branches through diplomatic understanding, treaty or

17 legislation." *Verdugo-Urquidez, supra*, 494 U.S. at 275.

18       In all key respects, the Guantanamo detainees are like the petitioners in

19 *Johnson*: They are aliens; they were enemy combatants; they were captured in

20 combat; they were abroad when captured; they are abroad now; since their

21 capture, they have been under the control of only the military; they have not

22 stepped foot on American soil; and there are no legal or judicial precedents

23 entitling them to pursue a writ of habeas corpus in an American civilian court.

24 Moreover, there are sound practical reasons, such as legitimate security concerns,

25 that make it unwise for this or any court to take the unprecedented step of

26 conferring such a right on these detainees.

27       Petitioners nevertheless argue that *Johnson* "is both factually and legally

28 inapposite for numerous reasons." Petitioners' first supposed distinction is that in

1   *Johnson* the petitioners already had been given access to American courts.  Not

2   so; the tribunal in *Johnson* was a Military Commission functioning in China; the

3   petitioners there, as here, were seeking to get *into* a federal court.[13]  Next,

4   petitioners argue that there are issues of fact that underlie jurisdiction which must

5   be resolved before dismissal.  Petitioners do not state what those supposed issues

6   are and in any event the question before this court *is* a purely legal one, as in

7   *Johnson*.  Finally, as petitioners put it, "[m]ost importantly the detainees are

8   'present' in the United States of America, because Guantanamo Naval Base is, as

9   a matter of both fact and law, the United States of America."  (Response, p.15).

10       Petitioners' last argument requires the Court to assess the legal and

11   juridical status of the Guantanamo Bay Naval Base.

12       B.    **Detainees were seized and at all times have been held outside the**

13            **sovereign territory of the United States.**

14       *Johnson* establishes that whether the Guantanamo detainees can establish

15   jurisdiction in any district court depends not on the nature of their claims but on

16   whether the Naval Base at Guantanamo Bay is under the sovereignty of the

17   United States.  Petitioners argue that the detainees are now within the territorial

18   jurisdiction of the United States and thus are entitled to a writ of habeas corpus.

19

20   ─────────────

[13]  It appears that the Guantanamo detainees will also be subjected to trial
21   before military commission.  On November 13, 2001, the President issued an
22   Executive Order entitling members of Al Qaeda and other individuals associated
     with international terrorism who are under the control of the Secretary of Defense
23   to be tried before "one or more military commissions" that will be governed by
24   "rules for the conduct of the proceedings . . .[and] which shall at a minimum provide
     for . . . a full and fair trial, with the military commission sitting as the triers of both
25   fact and law. . . ."  *See* Detention, Treatment and Trial of Certain Non-Citizens in the
26   War Against Terrorism,  66 Fed. Register 57,833 (November 13, 2001).  Thus, it
     appears that the detainees are similar to the petitioners in *Johnson* in this respect,
27   too.

28

1   But there is a difference between territorial jurisdiction and sovereignty, and it is

2   the latter concept that is key.  *See United States v. Spelar*, 338 U.S. 217, 70 S. Ct.

3   10, 11 (1949), in which the Supreme Court observed, "We know of no more

4   accurate phrase in common English usage than 'foreign country' to denote

5   territory subject to the sovereignty of another nation."  The Court finds that

6   Guantanamo Bay is *not* within the sovereign territory of the United States and

7   therefore rejects petitioners' argument.

8       The legal status of Guantanamo Bay is governed by a lease agreement

9   entered into by the United States and Cuba in 1903 and extended by those

10  countries in 1934.  *See Lease to the United States of Lands in Cuba for Coaling*

11  *and Naval Stations*, Feb. 16-23, 1903, U.S.-Cuba, T.S. No. 418 ("Lease

12  Agreement"); Treaty Between the United States of America and Cuba Defining

13  Their Relations, May 29, 1934, art. III, 48 Stat. 1682, 1683.  The 1903 agreement

14  provides that the United States shall lease Guantanamo Bay from the Republic of

15  Cuba for use as a coaling or naval station.  Lease Agreement, art. I.  Article III of

16  the 1934 Treaty provides that the 1903 lease shall "continue in effect" until the

17  parties agree to modify or abrogate it.

18      As to the legal status of Guantanamo Bay so long as it is leased to the U.S.,

19  the 1903 agreement states:

20          While on the one hand the United States recognizes the
            continuance of the ultimate sovereignty of the Republic of Cuba
21          over the above described areas of land and water, on the other
            hand the Republic of Cuba consents that during the period of
22          occupation by the United States of said areas under the terms of
            this agreement the United States shall exercise complete
23          jurisdiction and control over and within said areas.

24  Lease Agreement, art. III.

25      It is telling that in their brief petitioners do not even mention the first

26  clause of the 1903 agreement, which provides that Cuba explicitly retained

27  sovereignty.  The omission suggests that they realize that sovereignty is the

28  dispositive issue.

21

1       Relying instead only on the second clause, petitioners argue that because

2  the Lease Agreement provides that Guantanamo Bay is under the "complete

3  jurisdiction and control" of the United States, the detainees effectively are being

4  held within United States territory and thus are entitled to the writ of habeas

5  corpus.

6       One need only read the lease to realize that  petitioners' argument that

7  "jurisdiction and control" is equivalent to "sovereignty" is wrong.  The agreement

8  explicitly distinguishes between the two in providing that Cuba retains

9  "sovereignty" whereas "jurisdiction and control" are exercised by the United

10  States.  Cuba and the United States defined the legal status of Guantanamo Bay,

11  and this court has no basis, much less authority, to ignore their determination.

12  *Vermilya-Brown Co. v. Connell*, 335 U.S. 377, 380, 69 S.Ct. 140 (1948).  ("[T]he

13  determination of sovereignty over an area is for the legislative and executive

14  departments.").

15       In addition to the express terms of the Lease Agreement, the only federal

16  courts that have addressed the issue have held that Guantanamo Bay is not within

17  the sovereign territory of the United States and is not the functional equivalent of

18  United States sovereign territory.  In *Cuban American Bar Assoc. v. Christopher*,

19  43 F. 3d 1412, 1425 (11th Cir. 1995), *cert. denied*, 515 U.S. 1142, 115 S. Ct. 2578

20  and 516 U.S. 913, 116 S. Ct. 299 (1995), the Eleventh Circuit had to determine

21  whether Cuban and Haitian migrants temporarily detained at the Guantanamo Bay

22  Naval Base could assert rights under various United States statutes and the United

23  States Constitution.  *Cuban American Bar Assoc.*, 43 F. 3d at 1421.  Citing the

24  language of the Lease Agreement quoted above, the Court of Appeals stated "the

25  district court erred in concluding that Guantanamo Bay was a 'United States

26  territory.'  We disagree that control and jurisdiction is equivalent to sovereignty."

27  *Id.* at  1425.  The Court of Appeals then went on to reject the argument that

28  United States military bases which are leased abroad and remain under the

1  sovereignty of foreign nations are "'functionally equivalent' to being . . . within

2  the United States." *Id. See also Bird v. United States*, 923 F. Supp. 338, 342-43

3  (D. Conn. 1996) (holding that sovereignty over Guantanamo Bay rested with

4  Cuba and therefore plaintiff's tort claim was barred under the "foreign country"

5  exception of the Federal Tort Claims Act). The court finds the analyses and

6  conclusions of these courts persuasive.[14]

7      For the foregoing reasons, the court finds that sovereignty over

8  Guantanamo Bay remains with Cuba. The court therefore holds that petitioners'

9  claim that the Guantanamo detainees are entitled to a writ of habeas corpus is

10 foreclosed by the Supreme Court's holding in *Johnson*.

11                          **VI.**

12                     **CONCLUSION**

13     The Court understands that many concerned citizens, here and abroad,

14 believe this case presents the question of whether the Guantanamo detainees have

15 *any* rights at all that the United States is bound, or willing, to recognize. That

16 question is *not* before this Court and nothing in this ruling suggests that the

17 captives are entitled to no legal protection whatsoever. For this Court is

18          not holding that these prisoners have no right which the military
           authorities are bound to respect. The United States, by the [1949]

19

20     [14] The cases on which petitioners mainly rely to avoid this result do not

21 support their arguments. *United States v. Corey*, 232 F.3d 1166 (9th Cir. 2000), not

22 a habeas case, merely reached the unexceptional conclusion that federal courts have
   jurisdiction over a criminal case charging a *United States citizen* with offenses

23 committed at United States installations abroad. *Cobb v. United States*, 191 F.2d

24 604 (9th Cir. 1951) does not hold - - indeed, rejected the view - - that America's
   exclusive control over the Guantanamo Naval Base constitutes *de jure* sovereignty;

25 Okinawa, not Guantanamo Bay, was at issue in *Cobb* and the court found that *de jure*

26 sovereignty over Okinawa had *not* passed to the United States, so Okinawa was still
   a "foreign country" within the meaning of the Federal Tort Claims Act. *Id.* at 608.

27 Finally, the judgment in *Haitian Centers Council, Inc. v. McNary*, 969 F.2d 1326 (2d

28 Cir. 1992) was vacated by the Supreme Court in *Sale v. Haitian Centers Council,
   Inc.*, 509 U.S. 918, 113 S.Ct. 3028 (1993).

1            Geneva Convention . . . concluded an agreement upon the
treatment to be accorded captives.  These prisoners claim to be

2            and are entitled to its protection.  It is, however, the obvious
scheme of the Agreement that responsibility for observance and

3            enforcement of these rights is upon political and military
authorities.  Rights of alien enemies are vindicated under it only

4            through protests and intervention of protecting powers as the
rights of our citizens against foreign governments are vindicated

5            only by Presidential intervention.

6   *Johnson*, 339 U.S. at 789.[15]

7

8         For the foregoing reasons, the Verified Petition For Writ of Habeas Corpus

9   and the Verified First Amended Petition are both DISMISSED with prejudice.

10

11         IT IS SO ORDERED.

12

13   Dated:  February 21, 2002

14                                A. HOWARD MATZ
                                United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27         [15] The President recently declared that the United States will apply the rules

28   of the Geneva Convention to at least some of the detainees.  *See "U.S. Will Apply*
*Geneva Rules to Taliban Fighters,"* Los Angeles Times, February 8, 2002 at A1.